# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI, ex rel. Attorney General Eric S. Schmitt, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| UNITED STATES DEPARTMENT OF THE INTERIOR–BUREAU OF RECLAMATION, | ) ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) ) | |
| DAVID BERNHARDT, SECRETARY OF THE INTERIOR, in his official capacity, | ) ) ) | |
| BRENDA BURMAN, BUREAU OF RECLAMATION COMMISSIONER, in her official capacity, | ) ) ) ) | |
| MICHAEL S. BLACK, GREAT PLAINS REGIONAL DIRECTOR, in his official capacity, | ) ) ) ) | |
| ARDEN FREITAG, DAKOTAS AREA MANAGER, in his official capacity, | ) ) ) | |
| RYAN MCCARTHY, SECRETARY OF THE ARMY, in his official capacity, | ) ) ) | |
| BRIGADIER GENERAL D. PETER HELMLINGER, NORTHWEST DIVISION COMMANDER, in his official capacity, and | ) ) ) ) | |
| NORTH DAKOTA GARRISON DIVERSION CONSERVANCY DISTRICT, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

The State of Missouri ("Plaintiff") brings this action under the federal Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA") to enjoin the permitting and construction of the Central North Dakota Water Supply Project ("Central ND Project") unless and until Defendants have properly evaluated the impacts upon Missouri's human environment, as required by NEPA.

Defendants have violated the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 and the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–06, 1305, 3105, 3344, 4301, 5335, 5372, 7521 in publishing the Final Environmental Assessment and Finding of No Significant Impact for the Central ND Project. Defendants' purported NEPA analysis was flawed because it focused exclusively on the Central ND Project without considering the cumulative adverse impacts on Missouri when the Central ND Project is considered in combination with the Red River Valley Water Supply Project and other foreseeable water diversion projects. Defendants also failed to consider whether there are viable mitigation measures or alternatives to the Central ND Project that would prevent the adverse impacts on Missouri. Upon information and belief, Plaintiff alleges:

## JURISDICTION

1.     This is a civil action for a declaratory judgment and preliminary and permanent injunctive relief to prevent the permitting and construction of the Central ND Project contrary to federal law, specifically, NEPA, 42 U.S.C. §§ 4321–70h, and

the APA, 5 U.S.C. §§ 701–06. The Court has jurisdiction over this action pursuant to the APA, 5 U.S.C. §§ 701–06 and 28 U.S.C. § 1331 (federal question).

2.     The Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 705–06. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

3.     The requested relief would redress the actual, concrete injuries to Plaintiff caused by the United States Department of the Interior—Bureau of Reclamation's and the United States Army Corps of Engineers' failure to comply with duties mandated by the APA, NEPA and its implementing regulations, and the Bureau of Reclamation's own NEPA Handbook.

4.     Plaintiff has standing to challenge Defendants' improper actions because it owns property that is reasonably likely to be directly injured by the Central ND Project. Plaintiff also has a duty to protect the general welfare of its citizens from the threatened injuries posed by the Central ND Project.

5.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

## VENUE

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703.

## PARTIES

7.     Plaintiff is a sovereign state and brings this action on its own behalf to protect its sovereign and proprietary interests by preventing a direct injury to state-

3

owned properties. Plaintiff also asserts its police powers to protect the general welfare of Missouri citizens.

8.     Eric Schmitt is the duly appointed Attorney General of Missouri. He is authorized to file this complaint to protect the State of Missouri's interests.

9.     The Missouri Department of Natural Resources is the lead agency of the State of Missouri for all water quality and water quantity issues.

10.     Defendant Bureau of Reclamation is a part of the U.S. Department of the Interior and is charged with water management in Western states.

11.     Defendant Bernhardt is the Secretary of the Interior and is ultimately responsible for all of the activities of the Bureau of Reclamation including the Central ND Project. Defendant Bernhardt is being sued in his official capacity.

12.     Defendant Burman is the Commissioner of the Bureau of Reclamation. Defendant Burman is being sued in her official capacity.

13.     Defendant Black is the Great Plains Regional Director of the Bureau of Reclamation. Defendant Black is being sued in his official capacity.

14.     Defendant Freitag is the Area Manager of the Dakotas Area Office of the Bureau of Reclamation. Defendant Freitag is being sued in his official capacity.

15.     This Complaint will refer to Defendants Bernhardt, Burman, Black, Freitag, and the Bureau of Reclamation collectively as "the Bureau."

16.     Defendant U.S. Army Corps of Engineers is charged with the maintenance of the Missouri River channel and control of the river's main stem dams and reservoirs. 33 U.S.C. § 701-1.

4

17.     Defendant McCarthy is the Secretary of the Army and is ultimately responsible for all of the activities of the United States Army Corps of Engineers. Defendant McCarthy is being sued in his official capacity.

18.     Defendant Helmlinger is the Commander of the Northwest Division Army Corps of Engineers and is ultimately responsible for all of the activities of the Northwest Division, which includes the operation of the main-stem dams and reservoirs on the Missouri River. Defendant Helmlinger is being sued in his official capacity.

19.     This Complaint will refer to Defendants McCarthy, Helmlinger, and the United States Army Corps of Engineers collectively as "the Corps."

20.     Defendant North Dakota Garrison Diversion Conservancy District ("Garrison District") is named as a necessary party because it is a governmental agency and a body politic and corporate that was created by the State of North Dakota's legislature and is charged by state statute to divert Missouri River water for various uses by North Dakota's citizens. N.D. Cent. Code § 61-24 (1991).

## THE CENTRAL ND PROJECT

21.     The Central ND Project is a proposed water service contract between the Bureau and Garrison District reliant upon construction of a 6-mile pipeline and supportive facilities.

22.     The Central ND Project includes a contract with Garrison District to construct and maintain facilities including an intake in the McClusky Canal, wet well, pump station, and approximately 0.10 miles of the 6-mile pipeline.

5

23.     The McClusky Canal waters originate from Lake Audubon, which is connected to and is comprised of Missouri River water.

24.     As shown in the maps below, the 6-mile pipeline will deliver water from the McClusky Canal to the Central ND Project, which is proposed to connect to the Red River Valley Water Supply Project, a wholly state-sponsored project by North Dakota.



(Overview of the Project Area for the Proposed Central North Dakota Water Supply Project)



(Overview of the Proposed Central North Dakota Pipeline Project and the State- sponsored Red River Valley Water Supply Project)

25.     The Central ND Project will divert twenty cubic feet per second of water—approximately 15,000 acre-feet per year—from the Missouri River via the McClusky Canal, purportedly to provide water for speculative industrial uses to the presumed benefit of North Dakota counties.

26.     In 2019, the Bureau provided notice of—and commenced scoping for—another proposed diversion project in North Dakota, designated the Eastern North Dakota Alternate Water Supply Project, that also slated to remove water from the Missouri River.

27.     The proposed Central ND Project would divert water from the Missouri River at Lake Sakakawea through an existing diversion intake and receiving reservoir—Lake Audubon—via the McClusky canal.  The Garrison Dam and Lake Sakakawea, are a dam and reservoir, respectively, on the main stem Missouri River that are operated and maintained by the Corps and located upstream of Bismarck, North Dakota. The Central ND Project comprises water service and power preference contracts and access to federal land for a six-mile pipeline leading south from the McClusky Canal, which is proposed to connect to the Red River Valley Water Supply Project pipeline, another large-scale project that would divert Missouri River water out of basin.

28.     The Missouri River already is substantially depleted. It is estimated that, on average, 5.05 million acre-feet ("MAF") per year of Missouri River water, or approximately one-third of the annual average volume for the Missouri River at Bismarck, North Dakota, is consumed or evaporated by the time it reaches Garrison Dam from the Missouri River headwaters. Diverting additional water from the Missouri River prior to the Garrison Dam will inevitably lead to reduced storage and less water released from the reservoir system for downstream beneficial use.

7

29.     The Central ND Project is based upon speculative, regional industrial growth, in that neither the Bureau nor Garrison District have demonstrated a current purpose and need for water diversion.

## HISTORY OF THE CENTRAL ND PROJECT

30.     The Bureau conducted an environmental assessment in conjunction with the Central ND Project.

31.     The Bureau wrongly determined that the anticipated impacts of the Central ND Project on existing water needs and uses will be insignificant.

32.     The Bureau then issued a Finding of No Significant Impact ("FONSI").

33.     The FONSI briefly analyzed the 6-mile pipeline leading from the proposed Central ND Project to the Red River Valley Water Supply Project, but noted that the Red River Valley Water Supply Project, which is a wholly state-sponsored project, did not independently require the Bureau's approval.

34.     While drafting the environmental assessment's analysis and resulting FONSI, the Bureau considered the Red River Valley Water Supply Project only in a limited capacity.

35.     Independently, the Red River Valley Water Supply Project will divert an additional 145 cubic feet per second (or approximately 105,000 acre-feet per year) from the Missouri River—over seven times the quantity of water that would be diverted by the Central ND Project.

36.     The FONSI stated, without proper analysis, that the Central ND Project will not substantively contribute to climate change and will not affect any park lands, primate farming lands, wetlands, wild and scenic rivers, or ecologically critical areas.

## MISSOURI'S USE OF THE MISSOURI RIVER

37.     Missouri depends on the Missouri River for municipal and industrial water supply, navigation and transportation requirements, and providing reliable power to its citizens. Also, Missouri manages and maintains numerous state parks and conservation areas in the Missouri River floodplain, many of which contain wetlands and sensitive bottomland ecosystems that are sustained by their hydrologic connections to the Missouri River.

38.     Missouri's usage of the Missouri River varies seasonally throughout the year. Reduced flow during dry seasons and especially during drought conditions adversely affects the availability of Plaintiff's and Missouri citizens' ability to access water for municipal uses, Missouri's agricultural industry's capacity to transport crops, Missouri's power plants' aptitude to supply electricity to Missouri citizens, and Plaintiff's capability to maintain the fragile wetland ecosystems found in state parks and conservation areas.

39.     Missouri River reservoir system drought and flood risk reduction operators are entirely separate.  Therefore, for purposes of this lawsuit, Plaintiff's allegations of harm refer only to drought operations and the associated impacts to downstream flow support. This complaint does not address flood risk reduction operations, which should remain unaffected by this lawsuit.

## Municipal and Industrial Water Supply

40.    Missouri relies heavily upon the Missouri River for its municipal and industrial water supply.

41.    Approximately 2.5 million people, or about 40 percent of Missouri's population, are served directly or indirectly by the Missouri River.

42.    Missouri's municipal water systems and thermal electric power plants require approximately 3.6 MAF of demand from the Missouri River surface water, withdrawn annually. In addition, there is an estimated 1.3 MAF of demand from Missouri River alluvium for municipal and industrial water supply, withdrawn annually.

43.    Seven of Missouri's municipal water suppliers withdraw surface water directly from the river—Kansas City, St. Louis City, Boonville, Higginsville, Lexington, St. Charles, and Jefferson City.

## Agriculture and Missouri River Navigation

44.    Agriculture is the largest user of commercial river navigation on the Missouri River.

45.    This industry uses navigation to move fertilizer, soil supplements, and commodities to and from market.

46.    During crop year 2017, shipments of fertilizer/chemicals as well as food, grain, and farm products on the Missouri River totaled 450,000 short tons, equivalent to 18,000 semi-trucks.

47.     Most of this capacity either originates from or is destined for Missouri ports.

48.     Plaintiff, through the Missouri Department of Transportation, allocates resources annually to local Port Authorities to help develop and maintain public ports along the Missouri River.

49.     The water-level required for navigation along the Missouri River needs reservoir releases by the Corps sufficient to provide a discharge of 31,000 cubic feet per second at Sioux City, Iowa, 37,000 cubic feet per second at Nebraska City, Nebraska, and 41,000 cubic feet per second at Kansas City, Missouri.

50.     Meeting these target flows for navigation provides a 9-foot deep by 300-foot wide navigation channel along the Missouri River.

51.     All other downstream releases from the main-stem reservoir system are considered incidental or non-navigation flow support, which is assured until the system reaches catastrophically low levels (i.e. the sediment pool).

52.     The Corps projects that typically from April 1 to December 1 each year, between 4 MAF and 5 MAF of water is necessarily released from Gavins Point Dam located in South Dakota to provide incidental (non-navigational) flow support.

53.     The Corps projects that full service navigation flow support requires releases from the main stem reservoir system of between approximately 16 MAF to 17 MAF of yield annually from Gavins Point Dam located in South Dakota. Therefore, the Corps projects that a total of approximately 20 MAF to 22 MAF of yield is needed for navigational and non-navigational releases from Gavins Point Dam, to

provide full service flow support (i.e., creating a 9-foot deep by 300-foot wide navigation channel) and to avoid negative downstream impacts.

54.     Reductions in downstream flow support are determined by the Corps' engineering guide curves.

55.     These guide curves trigger reductions in downstream flow support early in a drought when the reservoir system is full or mostly full.

56.     Downstream navigation flow support is typically provided from the reservoir system from April 1 to December 1 of each year.

57.     For the remainder of the year, only incidental project releases are provided.

58.     Both navigation and non-navigation flow support level is dependent on system storage.

59.     As system storage decreases, so does downstream flow support.

60.     In order to have full service flow support, the system storage needs to be at or above 54.5 MAF of total system storage on March 15 each year.

61.     If total storage at Gavins Point Dam is below 31 MAF, the Corps will only provide non-navigation flow support during the regular navigation season (April 1 to December 1).

62.     In fact, the Corps will cut system releases to provide only minimum releases until reservoir storage rebounds.

63.     To adequately support full service navigation during the second half of the navigation season, the reservoir storage at Gavins Point Dam must be 57 MAF or greater on July 1 of each year.

64.     A full 8-month navigation system requires at least 51.5 MAF of storage on July 1.

65.     System storage levels below 51.5 MAF result in season length reductions on an incremental basis until a 6-month season is provided at 36.5 MAF.

66.     At the close of the flow support season, the Corps cuts reservoir releases from discharges adequate to enable navigation to non-navigational releases.

67.     When the Corps cuts reservoir releases from full service and full season support, the Missouri navigation industry suffers reduced profits and viability.

68.     The Missouri River provides, on average, 40 percent of the flow to the free-flowing middle Mississippi River. During drought conditions, the Missouri River has provided over 72 percent of the flow to the middle Mississippi River.

69.     Mississippi River navigation is restricted as the following discharge thresholds at St. Louis are reached:

| Navigation Restriction | Gage Reading* | Discharge (cfs) |
| --- | --- | --- |
| Normal Loading | above 0.5 ft. | >92,745 |
| No Restriction | 0.5 ft. -1.0 ft. | 81,831 to 92,745 |
| 25 barges | -3.0 ft to -1.0 | 68,474 to 81,831 |
| 20 barges | -5.5 ft to -3.0 | 53,375 to 68,474 |
| 16 barges | -6.5 to -5.5 ft | 48,290 to 53,375 |
| 8.5 ft. draft | -7.0 ft to -6.5 ft | 45,730 to 48,290 |
| 8.0 ft. draft | -7.5 ft to -7.0 ft | 43,247 to 45,730 |
| Navigation Halts | Below -7.5 ft. | 43,247 |

*(Impact stages (gage readings) depicted as updated for post rock pinnacle removal)

70.     The economic impacts to Mississippi River navigation quickly multiply due to the scale of this system and the amount moved.

71.     Over one million acres of Missouri River floodplain is located in Missouri, of which hundreds of thousands of acres are rich Missouri farmland.

72.     A substantial portion of that floodplain has been designated "prime" farmland by the United States Department of Agriculture.

73.     Commercial navigation on the Missouri River within Missouri alone is a multi-million-dollar industry. This industry has suffered because of reduced navigation service and shortened navigation seasons, which are caused by reduced storage levels in the reservoir system. Current Corps' modeling indicates that the March service level check has triggered drought-reduction measures approximately 63 percent of the time, and that the July service level check has triggered drought-reduction measures approximately 54 percent of the time. Each time drought-reduction measures are triggered, the Corps reduces downstream-flow support.

**Thermal Power Plants**

74.     Thermal power plants heat water to create steam, which is passed through a turbine to generate electricity. This steam must be cooled and allowed to convert back to a liquid water form in order to generate electricity effectivity and efficiently.

75.     The thermal power plants along the Missouri River are once-through power plants, which utilize water from the Missouri River and circulate that water through pipes to absorb heat from the steam.

14

76. These plants then discharge the water back to the Missouri River.

77. In Missouri there are eight thermal power plants that utilize water from the Missouri River and provide electricity to citizens of Missouri.

78. River flows and water surface elevations can affect the ability of power plants to effectively access water through their intakes.

79. Additional depletions from the Missouri River would have a detrimental impact on thermal power in Missouri because these depletions would further reduce flow support, which creates challenges with water access and river temperatures.

**Plaintiff's Wetlands and Parks**

80. Plaintiff, through its agencies, owns and manages five state parks (through the Missouri Department of Natural Resources) and thirty-three conservation areas (through the Missouri Department of Conservation), totaling approximately 42,000 acres, within the Missouri River floodplain.

81. The following list of state parks in Missouri contain wetlands that are managed by Plaintiff and are affected by changes in the levels of the Missouri River: Big Lake State Park (approximately 241 acres of wetlands), Lewis and Clark State Park (approximately 54 acres of wetlands), Weston Bend State Park (approximately 31 acres of wetlands), Van Meter State Park (approximately 163 acres of wetlands), and Confluence State Park (approximately 23 acres of wetlands).

82. Decreases in the Missouri River's levels significantly impacts both surface water access and alluvial connections that support ecological features located in these state parks and conservation areas.

83.     Low water levels in state parks and conservation areas affect park visitation, wetlands plant species resilience, waterfowl forage and migration, and fisheries productivity.

84.     Low water levels in state parks and conservation areas also negatively impact Missouri's ability to provide suitable ecosystems for the survival of wildlife and aquatic life for which Missouri is trustee, as well as resources for which both Missouri and the federal government are trustees, such as the endangered pallid sturgeon and the endangered interior least tern.

85.     Decreases in the wetlands water levels are associated with decreases in the level of the Missouri River. Reduced levels of downstream flow support from the reservoir system results in costly pumping efforts to maintain these fragile ecosystems.

86.     The effects on wetlands, state parks, and conservation areas can be seen year-round, but are especially prevalent during drought months and seasons where water-levels on the Missouri River are already low.

## Statutory and Regulatory Framework

### The Administrative Procedure Act ("APA")

87.     The APA provides for judicial review of final agency actions. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

16

## The National Environmental Policy Act
## ("NEPA")

88.     NEPA (42 U.S.C. §§ 4321–47) is the nation's basic national charter for the protection of the environment and it contains action-forcing provisions to make sure that federal agencies comply with the Act. 40 C.F.R. § 1500.1. NEPA's purpose is to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. 40 C.F.R. § 1500.1(c).

89.     NEPA requires that a federal agency proposing any major federal action significantly affecting the quality of the human environment must prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332(C).

90.     To determine whether an action's effects are "significant," agencies must consider both context and intensity. 40 C.F.R. § 1508.27; *see also* the Bureau's NEPA Handbook at 6-13.

91.     The Council on Environmental Quality ("CEQ"), created by NEPA, 42 U.S.C. § 4342, has adopted implementing regulations at 40 C.F.R. Chapter V that govern the purpose and preparation of NEPA documents.

92.     CEQ regulations indicate that if the proposed federal action is not one for which an EIS is normally required or categorically excluded, the agency shall first prepare an environmental assessment ("EA"). 40 C.F.R. § 1501.4(a)–(b). If an agency prepares an EA, it next makes a determination whether to prepare a full EIS. 40 C.F.R. § 1501.4(c).

93.     An EA must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

94.     An EA is intended to "provide sufficient evidence and analysis for determining whether to prepare" an EIS or a FONSI. 40 C.F.R. § 1508.9(a).

95.     The "scope" of an EIS is defined as "the range of action, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. § 1508.25.

96.     Following an EA, the agency's sole means of avoiding an EIS is to issue a FONSI. 40 C.F.R. § 1501.4(e).

97.     "Finding of no significant impact" means a document by a federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. 40 C.F.R. § 1508.13.

98.     The term "effects" under NEPA is defined to include "direct" and "indirect" effects caused by the action. 40 C.F.R. § 1508.8. "Effects includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." *Id.* The terms "effects" and "impacts" as used in NEPA regulations are synonymous. *Id.*

99. "Direct effects" are those "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

100. "Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* at § 1508.8(b).

101. An EIS is much more thorough than an EA, because an EIS must:

A. "[S]pecify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.

B. "Rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a).

C. "Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b).

D. "Include reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(c).

E. "Include the alternative of no action." 40 C.F.R. § 1502.14(d).

F. "Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference." 40 C.F.R. § 1502.14(e).

G. "Include appropriate mitigation measures not already included in the proposed action or alternatives." 40 C.F.R. § 1502.14(f).

H. "[D]escribe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15.

I. Include discussions of "the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented." 40 C.F.R. § 1502.16.

102. An agency is required to consider more than one action in a single EIS if they are "connected actions," "cumulative actions," or "similar actions." 40 C.F.R. § 1508.25.

103. "Connected actions" are those which:

A. Automatically trigger other actions which may require environmental impact statements.

B. Cannot or will not proceed unless other actions are taken previously or simultaneously.

C. Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

104.   NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

105.   To determine whether an action's effects are "significant," agencies must consider both context and intensity. 40 C.F.R. § 1508.27; *see also* the Bureau's NEPA Handbook at 6-13.

106.   A proposed action's effects "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

107.   The intensity part of the significance analysis refers to the severity of the anticipated impacts of the proposed action on the environment. 40 C.F.R. § 1508.27(b). To assess intensity, agencies should consider at least ten factors. *Id.* at § 1508.27(b)(1)-(10). Among other factors, agencies should consider unique characteristics of the geographic area such as wetlands or ecologically critical areas, the degree to which effects are likely to be highly controversial, the degree to which impacts are uncertain or involve unknown risks, the degree to which the action may establish a precedent for future actions with significant effects, whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and the degree to which the action may adversely affect an endangered or threatened species. *Id.*

108.   With respect to related actions and cumulative impacts, "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the

environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.* at § 1508.27(b)(7).

109. An agency is required to consider more than one action in a single EIS if they are "connected actions," "cumulative actions," or "similar actions." 40 C.F.R. § 1508.25.

110. The Bureau is the largest wholesaler of water in the country. Since 1902 it has constructed water projects that promote the economic development of the Western United States. There are no Bureau water projects in Missouri or any state to the East. The Bureau does not serve Missouri or its citizens, nor does it purport to act as *parens patriae* for the citizens of Missouri. Missouri's quasi-sovereign interests in seeing the Bureau comply with federal law are not and cannot be barred by the Federal Government.

111. The Corps operates six main-stem Missouri River dams and reservoirs. The dams and their corresponding reservoirs are: Fort Peck Dam and Fort Peck Lake in Montana; Garrison Dam and Lake Sakakawea in North Dakota; Oahe Dam and Lake Oahe in North Dakota and South Dakota; Big Bend Dam and Lake Sharpe in South Dakota; Fort Randall Dam and Lake Francis Case in South Dakota; and Gavins Point Dam and Lewis and Clark Lake in South Dakota and Nebraska. Each of these dams are among the largest dams of their design in the world. The Bureau maintains a relatively small reservoir on the main-stem of the Missouri River, at Canyon Ferry Dam in Montana.

112.    Pursuant to the authorities arising under the Flood Control Act of 1944 ("FCA"), the Corps adopted and published a Master Water Control Manual ("Master Manual") in 1979 for the purpose of operating the main-stem Missouri River reservoirs. The Corps revised the Master Manual on March 19, 2004 and again on November 26, 2018. Pursuant to the FCA, the Corps is charged with responsibility for maintaining and operating the dams and reservoirs in the Missouri River system for the primary purposes of flood control and navigation. Its actions are governed by the Master Manual.

113.    The 2004 Master Manual adjusted the engineering criteria so that upstream reservoirs retain more water earlier in a period of drought, compared to what was required under the original 1979 Master Manual.

114.    Reductions in downstream flow support (and thus downstream impacts) occur even when the reservoir system is mostly full (i.e., just under 57 MAF of remaining storage).

115.    In addition, reservoir sedimentation has further reduced storage allocation for downstream flow support.

116.    Thus, significant out-of-basin transfers from these reservoirs, such as the Central ND Project and the Red River Valley Water Supply Project, will further impact the quantity of water stored in the reservoirs, thereby adversely impacting the amount of water released to Missouri.

117. The Bureau is given limited authority under the FCA. This authority does not include authorization of withdrawals from the reservoirs for water supply purposes without the Corps' authorization.

## COUNT I

### Failure to prepare an Environmental Impact Statement (APA and NEPA Violation)
### Against Defendants Bureau of Reclamation, Bernhardt, Burman, Black, Freitag, and Garrison District

118. Plaintiff incorporates by reference and re-alleges the paragraphs above.

119. The Central ND Project is a major federal action significantly affecting the quality of the human environment.

120. NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether an action's effects are "significant," agencies must consider both context and intensity. 40 C.F.R. § 1508.27. Agencies may not segment a project into smaller pieces, *id.* at § 1508.27(b)(7), or rely on unproven mitigation measures to avoid finding significant effects and dodge the requirement to prepare an EIS.

121. The context and intensity of the Central ND Project make it a major federal action significantly affecting the quality of the human environment under NEPA, which requires preparation of an EIS, rather than merely an EA.

122. Furthermore, the Bureau improperly segmented the Central ND Project diversion from the Red River Valley Water Supply Project to avoid finding significant

24

effects and to improperly avoid the requirement to prepare an EIS. *See* 40 C.F.R. §§ 1508.27(b)(7), 1508.7 (defining cumulative impacts).

123. Because both the Central ND Project and the Red River Valley Water Supply Project will have significant impacts, which will be cumulative, the Bureau violated NEPA by failing to consider all of these impacts together in an EIS.

124. The Central ND Project will have the following significant impacts on downstream water support that the Bureau failed to analyze when it issued the FONSI: the twenty cubic feet per second withdrawal of water from the Missouri River will create downstream navigation concerns, temperature variances that affect the electricity supply to Missouri citizens, decreased ecological support for endangered species, increased pumping costs by Plaintiff to maintain its fragile wetlands ecosystems, and economic hardships in the form of decreased visitation to Missouri's state parks.

125. The true significance of the effects of the Red River Valley Water Supply Project is exemplified by the fact that when the Red River Valley Water Supply Project was first initiated as a federal project, preparation of an EIS was mandated. That EIS was completed in 2007 but a Record of Decision was never signed.

126. The Bureau's failure to prepare an EIS was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. Part 1502, and the APA, 5 U.S.C. § 706(2)(A).

127.    The Bureau's FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with law, because the Bureau failed to analyze the impacts from the Red River Valley Water Supply Project.

128.    The Bureau arbitrarily and unlawfully ignored or misapplied the definition of "effects," which necessarily include impacts from the Red River Valley Water Supply Project. These impacts were necessary to consider because the Red River Valley Water Supply Project cannot move forward without the Bureau's approval of the water service contract and Special Use Permit that were allegedly analyzed as part of the Central ND Project. Therefore, effects from the Red River Valley Water Supply Project "are caused by" the Bureau's contract and permit approvals and must be analyzed as part of the proposed action. *See* 40 C.F.R. § 1508.8.

129.    The Bureau's FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with law because the Central ND Project alone will have a significant impact on the human environment, and when combined with the Red River Valley Water Supply Project, will have an unprecedented impact on the Missouri River system. The full effects are unknown, because the potential devastation from these combined withdrawals has not been analyzed by any agency. Therefore, NEPA's goals and objectives are not satisfied.

<u>COUNT II</u>
**Failure to take a "hard look" at the effectiveness of the mitigation measures**
**(APA and NEPA Violation)**
**Against all Defendants.**

130.    Plaintiff incorporates by reference and re-alleges the paragraphs above.

26

131.   NEPA and its implementing regulations require that federal agencies take a hard look at measures to mitigate environmental impacts. Agencies must develop, discuss in detail, and identify the likely environmental consequences of proposed mitigation measures. 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c); 1508.25(b)(3).

132.   An agency may not merely state mitigation measures but must also evaluate their effectiveness. The adequacy of mitigation measures that an agency relies on must be supported by substantial evidence.

133.   Agencies fail to take a hard look at mitigation measures when they rely on unsupported, optimistic assumptions that mitigation measures will succeed and ignore alternative, opposite assumptions.

134.   The Central ND Project will divert water from the Missouri River to supply water for potential industrial purposes in North Dakota and may exacerbate other depletions that already threaten availability of water for existing uses and needs in Missouri. Depletions from the Missouri River affect Missouri's prime farmlands, municipal and industrial water supplies, navigation, power generation, wetlands ecosystem support, and state park visitation and economic support to Missouri.

135.   The Missouri River already is depleted an average of 5.05 MAF above Garrison Dam located just downstream of the proposed Central ND Project diversion intake, according to the Bureau of Reclamation's Depletion Database. The Central ND Project will augment a depletion of water caused by the Red River Valley Water

27

Supply Project, which creates a diversion that is already more than seven times larger than the anticipated diversion from the Central ND Project.

136.    The Bureau of Reclamation analyzed the 6-mile pipeline in isolation, thus failing to consider the exacerbation by the Central ND Project of the real and foreseeable environmental impacts of the Red River Valley Water Supply Project.

137.    The Bureau only evaluated mitigation measures related to the Central ND Project without consideration of the Red River Valley Water Supply Project. In fact, the mitigation measures exclude any discussion of the Red River Valley Water Supply Project.

138.    The Bureau relied solely upon the Garrison District to undertake mitigation measures. The EA and FONSI fail to demonstrate that the mitigation measures will be effective or that they would completely compensate for, or reduce to a minimum, the significant adverse impacts from the diversion of water from *both* the Central ND Project and the Red River Valley Water Supply Project. Thus, the Bureau lacked a basis to conclude that many of the mitigation measures would be effective and failed to consider the possibility that the mitigation measures may not prevent significant impacts to Plaintiff and its citizens.

139.    The Bureau's failure to take a hard look at the effectiveness of the mitigation measures as they pertained to the Central ND Project and the connected Red River Valley Water Supply Project was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its

implementing regulations, 40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c), and the APA, 5 U.S.C. § 706(2)(A).

<u>COUNT III</u>
**Failure to take a "hard look" at the adverse impacts of the Central ND Project, including direct, indirect, and cumulative impacts (APA and NEPA Violation) Against all Defendants.**

140.    Plaintiff incorporates by reference and re-alleges the paragraphs above.

141.    Regardless of whether an EIS or an EA is prepared, NEPA requires a federal agency to consider "any adverse environmental effects which cannot be avoided," 42 U.S.C. § 4332(2)(C)(ii), and to take a hard look at direct, indirect, and cumulative impacts from proposed actions. 40 C.F.R. §§ 1502.16, 1508.9(b), 1508.25(c). An agency meets its hard look requirement if it has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

142.    The Bureau failed to analyze the cumulative impacts of the diversion of water resulting from *both* the Central ND Project and the Red River Valley Water Supply Project.

143.    For many of the impacts that it did assess, the Bureau failed to articulate a rational connection between the facts and its conclusions. For example, the EA and FONSI make no mention of downstream impacts, namely to other states that rely upon the Missouri River for its water supply.

144.    The Bureau also failed to fully evaluate other direct and indirect impacts from the Central ND Project and the Red River Valley Water Supply Project in failing

29

to provide any discussion of downstream impacts to other states that rely on the Missouri River for its water supply.

145.    The Central ND Project proposes to use permanent infrastructure on Lake Sakakawea.  Currently, the Corps considers all water supply within Lake Sakakawea as "surplus" water under the Flood Control Act.  33 U.S.C. § 708.  "Surplus" water, pursuant to Section 6 of the Flood Control Act, may only be contracted and available on a temporary basis by the Corps' authority.  Accordingly, the Corps, in reviewing the EA and FONSI, failed to take a hard look at the permanent infrastructure proposed to be used by the Central ND Project which will necessarily provide a permanent ability to remove water from a location where only temporary removal and allocation is allowed by statute.  Thus, the Corps is in potential violation of the Flood Control Act in allowing the Central ND Project to be constructed.  Further, the statute explicitly prohibits any usage of surplus water that adversely affects existing lawful uses, such as downstream flow support for navigation and water supply, and therefore, the Central ND Project would also be in violation of the 1944 Flood Control Act.

146.    A diversion as significant as that proposed by the Central ND Project is neither temporary in nature nor free from adverse impacts to existing uses within the Missouri River reservoir system, and therefore is outside the Corps' authority.

147.    The Bureau's and Corps' failure to take a hard look at the adverse impacts of the Red River Valley Water Supply Project in relationship to the Central ND Project, including all direct, indirect, and cumulative impacts, was arbitrary,

capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.9, 1508.25, and the APA, 5 U.S.C. § 706(2)(A).

### COUNT IV
**Failure to consider all reasonable alternatives**
**(APA and NEPA Violation)**
**Against all Defendants.**

148.    Plaintiff incorporates by reference and re-alleges the paragraphs above.

149.    NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Alternatives must be given full and meaningful consideration, whether the agency prepares an EA or an EIS. *See* 40 C.F.R. §§ 1502.14, 1508.9(b). The existence of a viable but unexamined alternative renders a NEPA analysis inadequate.

150.    An EA or EIS must also discuss the purpose and need for the project. 40 C.F.R. §§ 1502.13, 1508.9(b). While agencies have discretion when defining the purpose and need of a project, their discretion is not unlimited and an agency may not define its objectives in unreasonably narrow terms such that the outcome is preordained.

151.    Here, the Bureau could have proposed a suite of alternatives that would provide water supply for each basin individually but would avoid the harmful transboundary export of this limited resource. These alternatives could include: conjunctive use (groundwater and surface), system redundancy (varied sources),

31

expanded conservation, and the development of additional in-basin water supply storage and water re-use, to name just a few.

152.    The Bureau's failure to consider a reasonable range of alternatives was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(iii), (E), its implementing regulations, 40 C.F.R. §§ 1502.14, 1508.9(b), and the APA, 5 U.S.C. § 706(2)(A).

## CONCLUSION

Defendants have failed to comply with NEPA and the APA because:

153.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, Freitag, and Garrison District failed to provide sufficient evidence and analysis in the EA;

154.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to prepare an EIS when required;

155.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to consider all reasonable alternatives;

156.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to fully consider the no-action alternative;

157.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to take a hard look at the environmental impacts of the Central ND Project and the significant impacts on the Missouri River system and those who depend upon it;

158.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to take a hard look at the cumulative impacts of diversions of Missouri River water;

159.    Defendants Bureau of Reclamation, Bernhardt, Burman, Black, and Freitag failed to adequately account for the impacts of the Red River Valley Water Supply Project, which the Central ND Project directly supports;

160.    Defendants U.S. Army Corps of Engineers, McCarthy, and Helmlinger failed to consider the impact that its decision to allow the withdrawal of water from a reservoir under its control for an out-of-basin transfer will have on the human environment.

161.    All Defendants' attempt to comply with the mandates of NEPA was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

162.    Plaintiff does not have any other adequate remedy at law.

163.    Upon information and belief, Plaintiff is certain to suffer irreparable injury if the Central ND Project is allowed to proceed as proposed without proper contemplation of and compliance with NEPA.

WHEREFORE, Plaintiff respectfully prays this Court issue a preliminary and/or permanent injunction prohibiting permitting, approving, or otherwise authorizing construction related to the Central ND Project and taking any construction or steps toward construction on the Central ND Project unless and until Defendants comply with NEPA by creating an EIS that fully considers the significant

33

environmental impacts of the proposed Central ND Project and adequately takes a hard look at mitigation measures and reasonable alternatives and complies with the Dakota Water Resources Act, PL 106-554, 114 Stat. 2763. Missouri will suffer irreparable harm in the absence of a preliminary and permanent injunction, and the requested injunction will benefit the public interest and all citizens and states located downstream of North Dakota on the Missouri River.

Further, Plaintiff respectfully prays this Court issue a declaratory judgment:

A.    Declaring that the Central ND Project is a major federal action significantly affecting the human environment;

B.    Declaring that the Draft and Final EA and the FONSI do not comply with NEPA;

C.    Declaring that the Bureau must fully analyze the impacts from the Red River Valley Water Supply Project to achieve NEPA compliance for the Central ND Project; and

D.    Declaring that the Corps is required by NEPA to prepare an EIS that complies with CEQ regulations prior to authorizing any withdrawal from the Missouri River system for the Central ND Project.

Plaintiff also respectfully requests that the Court grant attorneys' fees and further relief as the Court deems just and proper.

34

Respectfully Submitted,

**ERIC S. SCHMITT**
Attorney General

/s/ Cheryl A. Schuetze
Cheryl A. Schuetze, #53736
Timothy P. Duggan #27827
Amber L. Krisp, #70176
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-3321 Telephone
(573) 751-5660 Facsimile
Email: Cheryl.schuetze@ago.mo.gov
        Tim.duggan@ago.mo.gov
        Amber.krisp@ago.mo.gov
**ATTORNEY FOR PLAINTIFF**
**STATE OF MISSOURI**