# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

STATE OF MISSOURI, ex rel. Attorney
General Eric S. Schmitt,

        Plaintiff,

v.

    Case No. 2:20-cv-4018-NKL

UNITED STATES DEPARTMENT OF THE
INTERIOR–BUREAU OF RECLAMATION,

        Defendants.

## ORDER

Plaintiff State of Missouri brought this action to seek judicial review under the Administrative Procedures Act, 5 U.S.C. §§ 701–06 ("APA"), the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Water Supply Act of 1958, 43 U.S.C. § 390b ("WSA"), of the analysis of the Central North Dakota Water Supply Project (the "Central ND Project") by the United States Department of the Interior-Bureau of Reclamation ("Reclamation"). Plaintiff moved for summary judgment, and defendants Reclamation, United States Army Corps of Engineers ("Corps"); Secretary of the Interior Debra Haaland, Acting Bureau of Reclamation Commissioner Camille Calimlim Touton, Missouri Basin Regional Director Brent C. Esplin, Dakotas Area Manager Joseph E. Hall, Acting Secretary of the Army John E. Whitley, and Northwest Division Commander Brigadier General D. Peter Helmlinger (together, the "Federal Defendants"), cross-moved for summary judgment, with defendant North Dakota Garrison Diversion Conservancy District ("Garrison Diversion") and Intervenor-Defendant State of North Dakota joining in the cross-motion. Non-parties MO-ARC Association and the Coalition to Protect the Missouri River, as *amicus curiae*, submitted briefs concerning the issues presented.

For the reasons set forth below, Plaintiff's motion is denied and Defendants' motion is granted.

## I. Undisputed Facts

### a. North Dakota Water Supply Projects

Garrison Diversion is an instrumentality and political subdivision of the State of North Dakota, established as the primary state entity to oversee the realization of the Garrison Diversion Unit of the Missouri River Basin Project as authorized by the Flood Control Act of 1944. Garrison Diversion was established to "to make available within the district[] waters diverted from the Missouri River for irrigation, domestic, municipal, and industrial needs, and for hydroelectric power, recreation, fish, wildlife, and other beneficial and public uses." Garrison Diversion's mission is to provide for the future economic welfare and prosperity of the people of North Dakota, particularly those within Garrison Diversion's boundaries, by providing "a reliable, high quality and affordable water supply."

Garrison Diversion has taken the lead in developing water supply projects throughout central and eastern North Dakota and is currently contemplating three alternative water projects. Under construction is the non-federal, state-sponsored, Red River Valley Water Supply Project (the "Red River Valley Project"), which will deliver 165 cubic feet per second ("cfs") of water from the Missouri River to Lake Ashtabula, 130 miles to the east, with distribution lines along the way to deliver 20 cfs of water within the Missouri River Basin and 145 cfs to communities within the Hudson Bay Basin.[1]

---

[1] Before the development of the state-sponsored Red River Valley Project, Reclamation had studied the creation of a federal Red River Valley water supply project pursuant to the Dakota Water Resources Act. An environmental impact statement ("EIS") was completed for the federal

There are two options for water supply from federally owned facilities also being considered as alternatives to obtain the same 165 cfs water supply. One is the Central ND Project, the project at the center of this dispute. As a cost-saving alternative to providing the 20 cfs of water supply from the Missouri River, Garrison Diversion requested that Reclamation issue a water service contract providing a flow of 20 cfs from the McClusky Canal and Pick-Sloan Program preference power in order to serve those central North Dakota counties located within the Missouri River Basin.[2]

### b. The Central ND Project

Lake Sakakawea is a reservoir on the main stem Missouri River system that is operated and maintained by the Corps. Water is pumped from Lake Sakakawea into Lake Audubon, and flows by gravity through the McClusky Canal, which originates at Lake Audubon and extends 73.6 miles east.

Reclamation's NEPA analysis for the Central ND Project analyzed the construction of a six-mile stretch of pipeline that would deliver up to 20 cfs of water from the McClusky Canal into the "state-sponsored RED RIVER VALLEY PROJECT main transmission line, which travels west to east and will be utilized to serve water to both the Red River Valley and the Central North Dakota Area." The Red River Valley Project, which is sponsored by the State of North Dakota,

---

Red River Valley project in 2007, but a Record of Decision ("ROD") was never signed for a federally authorized project.

[2] The third alternative water supply option is known as the Eastern North Dakota Alternate Water Supply Project ("Eastern North Dakota Project"), which obtains the entire 165 cfs from the McClusky Canal and transports it for in-basin and out-of-basin use. ENDAWS is simply a different intake location for the same 165 cfs total water supply needed from the three options being considered. Reclamation prepared a complete EIS and issued a ROD regarding ENDAWS on January 15, 2021.

intends to utilize an intake directly on the Missouri River as a water source, in addition to the pipeline that would deliver Missouri River water from the McClusky Canal. The Red River Valley Project proposes to divert 145 cfs directly from the Missouri River out of basin, in addition to the 20 cfs that it would obtain from the McClusky Canal through the six-mile pipeline that Reclamation analyzed as part of the Central ND Project.

The Central ND Project, if constructed, will be one of the first projects to fulfill the purposes of the Garrison Diversion Unit Act of 1965 and the Garrison Diversion Unit Reformulation Act of 1986, as amended by the Dakota Water Resources Act of December 21, 2000. "Congress' intent in enacting these statutes was to ensure that the water needs of the State of North Dakota," including industrial needs, would be met. The final Environmental Assessment ("EA") describes the purpose and need for the Central ND Project as municipal, rural, and industrial ("MR&I") water supply for central North Dakota and to "determine eligibility of Garrison Diversion to receive Pick-Sloan Missouri Basin Program . . . preference power and a water service contract for 20 cfs."

### c. NEPA Process

Reclamation's NEPA process for the CNDP commenced with scoping, in which it sought public comments as to the scope of the analysis it should provide by sending a letter to select participants. Plaintiff maintains that neither it nor any downstream states or interest groups received that letter, and the process was not published in the Federal Register.

Informed by its scoping process, Reclamation issued a draft on August 17, 2017. On September 19, 2017, Plaintiff requested a 30-day extension on the public comment period on the Draft EA. On October 6, 2017, Plaintiff provided comments.

4

On April 17, 2018, in response to public comments regarding the draft EA related to, *inter alia*, the draft EA's purpose and need statement, geographic scope and cumulative impact analysis, and Missouri River depletions, Reclamation issued a Revised Draft EA. By letter dated April 25, 2018, the Missouri Department of Natural Resources requested a 30-day extension of the public comment period on the Revised Draft EA. In its letter, the Department stated that it was not aware that the Revised Draft EA for the Central ND Project was released and available until April 23, 2018. Reclamation authorized a 15-day extension, and the comment period ended on or about May 17, 2018.

On May 17, 2018, Plaintiff submitted its comments. Reclamation responded to the substantive comments received on the Revised Draft EA, including those submitted by Plaintiff. However, the parties dispute whether Reclamation's responses to Plaintiff's substantive comments were adequate.

After receiving and considering additional public comments on the revised draft EA, Reclamation issued its final EA, along with a Draft Finding of No Significant Impact ("FONSI") in July 2018. Reclamation made that draft FONSI available for public review for a period of 30 days.

In September 2018, Reclamation issued its final FONSI and Final EA, making its final determination that the Central ND Project would not result in any significant environmental impacts, and that therefore no environmental impact statement was required under NEPA.

Reclamation's proposed action related to the Central ND Project includes five separate components:

    a) Reclamation's issuance of a 40-year water service contract to Garrison Diversion that makes up to 20 cfs of federal water available from the McClusky Canal for the Central ND Project.

b) Reclamation's determination of project eligibility for Pick-Sloan Missouri Basin Program preference power to Garrison Diversion for the Central ND Project.

c) Reclamation's issuance of a 25-year Special Use Permit to Garrison Diversion to construct and maintain infrastructure related to the Central ND Project on Reclamation's land, including an intake in the McClusky Canal, a wet well, a pump station, and approximately one-tenth of a mile of pipeline.

d) Reclamation's issuance of a Special Use Permit to a utility company for installation of power lines on or across Reclamation land to power the pump station.

e) The construction of six miles of pipeline for delivery of up to 20 cfs from the McClusky Canal to the Red River Valley Project.

Reclamation's Final EA defined the "Project Area" of the Central ND Project as: "The Central North Dakota Water Supply Project facility location, including the pump station, six miles of pipeline, and ten miles of electrical facilities."

Reclamation stated that "[a] supplemental water supply is needed for continued growth and industrial development in the region and to support economic development in Central North Dakota." The projected water demand for the Central ND Project is based on future projections of industrial water needs by communities in North Dakota. However, the "No Action Alternative" indicates that the Red River Valley Project is capable of siphoning the extra 20 cfs in addition to the already anticipated 145 cfs of water necessary to fully satisfy North Dakota's future needs for water.

For its cumulative impacts analysis, Reclamation evaluated a geographic scope that included a portion of the Red River Valley Project and tie-in that would occur in the proposed 150-foot right of way of the Central ND Project. Reclamation's cumulative impacts analysis concluded that the additional depletions of 14,483 acre-feet of water from the Central ND Project represented only "a 0.2% increase" in the approximately 6.6 million acre-feet depleted every year above the Garrison Dam. Reclamation concluded that the Central ND Project's depletions "are extremely small" relative to the storage capacity of Lake Sakakawea. Specifically, Reclamation concluded

6

that: "Due to the annual depletion for the Proposed Project of 14,483 acre-feet, which represents only 0.06 percent of Lake Sakakawea's storage capacity, the effects on reservoir levels and dam releases would likely not be measurable." AR at BOR-000000080. The FONSI stated that "[t]he Proposed Action will be limited in geographic context. The environmental effects as described in the EA and summarized below will not be noticed beyond the local scale." The FONSI further stated: "There are no park lands, prime farm lands, wetlands, wild and scenic rivers, or ecologically critical areas that would be negatively impacted by the [Proposed Action]."

The Snake Creek Pumping Plant is the diversion intake located on Lake Sakakawea in the Missouri River basin that supplies water to Audubon Lake and the McClusky Canal. The EA does not specify any operation criteria for the Snake Creek pumping plant, the Central ND Project, or the level, if any, at which Reclamation would curtail operations diverting water to the Central ND Project. However, the Federal Defendants point out that the authorizing legislation establishes the volume of water available for use via the Garrison Unit, and the water service contract to be issued for the Central ND Project as a result of the Reclamation's decision is supposed to identify all appropriate operating criteria associated with the water withdrawal.

The EA proposes the following mitigation measures:

a) "Garrison Diversion, as the contracting partner, assumes responsibility to ensure mitigation for all unavoidable wetland and other wildlife habitat losses [sic] with equivalent (like) habitat according to local, state and federal regulations."

b) "If the site is eligible as a historic property, initially Reclamation, NDSHPO, and other interested parties, depending on the type of property, will consult to determine a plan of mitigation."

c) "Environmental Mitigation Commitments – These are commitments included as an inseparable component of this Proposed Action. They are designed to offset potential for significant environmental effects resulting from the Proposed Action. These commitments will be implemented to (1) prevent, minimize, or offset the occurrence of potential for adverse environmental effects and (2) ensure compliance with applicable Federal and State regulations designed to protect fish

7

and wildlife resources, important habitats and sensitive areas, cultural and paleontological resources, human health and safety, and the public interest."

The EA states, "[p]otential impacts of the [Central ND Project] on the Missouri River Mainstem System will be very similar to the potential impacts disclosed in the Final [Supplemental Environmental Impact Statement] for the Northwest Area Water Supply Project and those impacts were negligible." The EIS for the Northwest Area Water Supply Project (the "Northwest Area Project") and the cumulative impacts research completed for that project are attachments to the EA.

The Proposed Action technically does not authorize construction of a water system to deliver Missouri River water into the Hudson Bay Basin. The 20 cfs proposed to come from Central ND Project is supposed to remain within the Missouri River basin in Central North Dakota, and not get diverted to the Red River Valley. The proposed Water Service Contract providing up to 20 cfs of federal water from the Canal will include a condition that the water is for use only in the Missouri River Basin. Further, Reclamation imposed as requirements for the Central ND Project that "[a]t the delivery point for each user, a flow meter and control valve would be utilized to monitor and regulate the flow leaving the main RED RIVER VALLEY PROJECT pipeline." The goal of these features is to ensure that the proposed action will not withdraw any more water from the Canal than Central ND Project users in the Missouri River Basin would need. However, Plaintiff insists that the water from the Central ND Project will be mixed with the water from the Red River Valley Project, and therefore it will not be possible to physically separate the water intended for Missouri River Basin use from the water destined for the Red River Valley Project for use out of basin.

Ultimately, despite the proposed physical connection between the Central ND Project and the Red River Valley Project, Reclamation concluded that, for NEPA purposes, the Red River

Valley Project "is not a connected action" with respect to the Central ND Project. AR at BOR-000000017. The EA states that "the state-sponsored [Red River Valley Project] will proceed independent of the [Central ND Project] and does not need approvals from Reclamation." The EA states:

> Reclamation's decision as to whether to approve a 20 cfs water supply contract, SUP [Special use permit] and authorization of a preference power contract will have no bearing on whether the state-sponsored RED RIVER VALLEY PROJECT proceeds and as such, the state- sponsored RED RIVER VALLEY PROJECT is not a connected action. Because Reclamation lacks control over the RED RIVER VALLEY PROJECT through its decision about whether to approve the water supply contract, Reclamation has determined that the appropriate geographic scope of the Proposed Action is to evaluate the impacts within the project area as described in the EA, plus the cumulative effects of the portion of the RED RIVER VALLEY PROJECT that occur within the Project Area. The EA is properly limited to the direct, indirect and cumulative impacts of the Proposed Action.

The "latest cumulative impacts analysis of the Missouri River System" that Reclamation incorporated into its EA for the Central ND Project was not created for the Central ND Project, but included the Final Supplemental EIS for the Northwest Area Project—another project that withdrew water from the Missouri River at Lake Sakakawea—and the Final EIS for the federal Red River Valley Project. The Corps' 2013 Cumulative Impacts to the Missouri River for the Bureau of Reclamation's Northwest Area Project determined that cumulative impacts of total withdrawals from the Missouri River through 2060 may have an economic impact on Missouri River shipping.

The service level for the first half of the navigation season (April 1–June 30) for the Missouri River reservoir system is based on the total system storage check on March 15. If the storage is above 54.5 million acre-feet, the Corps provides full-service flow support for the first half. The service level for the second half of the navigation season (Jul 1 - Dec 1) is based on the

total system storage check on July 1. If the storage is above 57.0 million acre-feet, the Corps provides full-service flow support for the second half.

Although the EA notes that M&I projects are authorized, the Missouri River Mainstem Reservoir System does not contain storage specifically dedicated, or "allocated," for M&I water supply.

### d. Plaintiff's Interest

Plaintiff has submitted extra-record material that typically cannot be considered in an APA case, as it is "well-established" that the Court's review under the APA is limited to the administrative record that was before the agency when it made its determination. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004). The Court therefore notes the following facts, which substantively are undisputed, only insofar as they bear on Plaintiff's interest in the proposed action.

Impacts to the lower Missouri River occur frequently as reservoir levels decrease early in a drought, reducing downstream flow support and adversely impacting hydropower generation. Increased frequency of flow restrictions from the main-stem Missouri River reservoirs results in increased frequency of lower stages on the lower Missouri River. Drought cycles of the Red River of the North and the Missouri River basins are concurrent and the water diverted from each would impact the downstream flow support on the Missouri River with increased frequency, the magnitude of service level, and season length cuts.

Within Missouri alone, there is an estimated 4.9 million acre-feet demand withdrawn annually from the Missouri River for use by municipal, industrial, and thermal electric water systems. In 2019, approximately 2.5 million people—about 40 percent of the State of Missouri's population—acquired their drinking water either directly or indirectly from the Missouri River.

The Missouri River Basin project and the navigation channel along the Missouri River were authorized by Congress in the Flood Control Act of 1944 and Rivers and Harbors Act of 1945. The navigation channel was designed to secure a permanent, continuous, open river navigation channel, 9 feet deep by 300 feet wide for a distance of 735 miles from Sioux City, Iowa to the mouth of the river near St. Louis, Missouri. Plaintiff argues that decreases in barge shipments on the Missouri River will lead to increases in air pollution, increases in safety hazards, and increases in shipments of hazardous materials through populated areas by rail.

The Missouri River and its floodplain are intricately connected by surface and subsurface water throughout the year. The entire Missouri River floodplain in Missouri accounts for approximately 751,513 acres. The State of Missouri manages over 5,000 acres of park land within the Missouri River floodplain, containing over 500 acres of wetlands recognized within the National Wetland Inventory. Those wetlands provide a wide array of ecological services, such as improving water quality, providing habitat for unique and rare plant and aquatic species and migrating waterfowl, and providing recreational opportunities for park visitors.

The wetlands provide important habitat and other ecological services for a wide range of species of birds, fish, amphibians, reptiles, bats, and invertebrates that all rely on the connectivity of the Missouri River to the riverfront forest and the wetlands along the Missouri River. There are currently 49 fish and wildlife species of conservation concern and 29 plant species of conservation concern that use or are located within the Missouri River and its floodplain habitats, and the Missouri River floodplain is a critical location for greater than 15% of all avian species in North America. Lower flows in the river, and thereby the water table of Missouri River floodplain habitats, would negatively impact local amphibians and reptiles that use seasonal and semi-

permanently flooded habitats for critical life history stages. For example, if wetlands begin to dry up, smaller, less mobile species like frogs and salamanders are likely to desiccate and die.

The water levels in the wetlands in Missouri's state parks that are hydrologically connected to the Missouri River are managed through a system of canals, stop-logs, and pumps. Lower water levels of the Missouri River directly impact Missouri's wetlands that are located within the Missouri River floodplain by decreasing wetland area and volume; devastating habitats for unique and rare plant, aquatic species, and migrating waterfowl; diminishing opportunities for recreational activities within Missouri's state parks; and increasing pumping costs to maintain the fragile wetland ecosystems. Further reductions in the flow of the Missouri River would exacerbate the need for the State of Missouri to intensively manage and maintain its wetlands within the Missouri River floodplain.

The Missouri River is a key tributary to the Mississippi River, contributing an average of over 40 percent of the flow to the Mississippi River. During drought conditions, the percent contribution can be much higher. For example, during the 2012–2013 drought, the Missouri River contributed to a maximum of over 72 percent of the flow to the Mississippi River.

### e. The Dispute

On February 4, 2020, seventeen months after the issuance of the FONSI, Plaintiff filed a lawsuit against the Federal Defendants and Garrison Diversion.

The State of North Dakota moved for and received permission to intervene as a defendant.

## II. Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on

a motion for summary judgment, the court must draw "all justifiable inferences" in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Discussion

Both Plaintiff and the Defendants seek summary judgment on the five counts asserted in the Amended Complaint.  The first four counts allege violations of the APA and NEPA:  Count I alleges failure to prepare an EIS; Count II alleges failure to take a "hard look" at the effectiveness of the mitigation measures; Count III alleges failure to take a "hard look" at the adverse impacts of the Central ND Project; and Count IV alleges failure to consider all reasonable alternatives. Count V alleges failure to acquire Congressional approval of the Central ND Project in violation of the WSA.[3]

### a.    Whether Defendants Violated the National Environmental Policy Act

The Supreme Court explained the "twin aims" of NEPA as follows:

> First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quotation marks and citations omitted).   "While NEPA does not authorize a private right of action, the Administrative Procedure Act (APA) permits judicial review of whether an agency's action complied with NEPA."  *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973 (8th Cir. 2011).

---

[3] The Court does not consider in this Order issues raised by the amici that were not raised in the parties' briefs.  *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 827 (8th Cir. 2009) (declining to consider issue "because it was raised to this court by the amici and not by the parties").

"NEPA is a procedural statute that mandates no substantive results; so long as an agency has taken a 'hard look' at an action and has followed NEPA's procedures, its substantive decision will not be overturned by a court unless it is arbitrary, capricious, or an abuse of discretion." *Sierra Club v. Watkins*, 808 F. Supp. 852, 859 (D.D.C. 1991) (citing, *inter alia*, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)); *see also* 5 U.S.C. § 706(2)(A) (providing that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions of law found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). "Although the contours of the 'hard look' doctrine may be imprecise, [the Court's] task is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 97-98).

"[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Marsh*, 490 U.S. at 378 (quotation marks and citation omitted). If an agency's determination is supportable on any rational basis, [the Court] must uphold it." *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 763. Further, the court "must generally be at its most deferential" when examining a scientific determination that is within an agency's special expertise. *Baltimore Gas & Elec.*, 462 U.S. at 103.

Plaintiff bears the burden of proof. *Guaranty Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 794 F.2d 1339, 1342 (8th Cir. 1986).

Plaintiff argues that Defendants failed to (a) adequately analyze the adverse impacts (Count III), (b) adequately analyze the mitigation measures (Count II), and (c) adequately consider reasonable alternatives (Count IV). Plaintiff argues that proper analysis would have established that the Central ND Project constitutes "a major federal action" and therefore required an EIS, and not just a FONSI, and the failure to create an EIS violated the NEPA (Count I).

The heart of the dispute regarding Defendants' compliance with NEPA concerns the significance of the Central ND Project's effects on Missouri River water. The EA concludes, and Defendants argue, that the Central ND Project by itself involves only an "extremely small" amount of water relative to the volume of water stored in Lake Sakakwea. BOR-00000080. Plaintiff and the *amici* argue that, when considered in conjunction with the Red River Valley Project and North Dakota's future plans for other projects as NEPA requires, and given the effect of current depletions in Missouri River waters, the Central ND Project's diversion of water will affect the quality of the human environment surrounding the project and further downstream. Plaintiff insists that further depletions, including those contemplated in the Central ND Project and the Red River Valley Project, must be more thoroughly analyzed under the NEPA. Plaintiff asks the Court to order Defendants to complete an EIS prior to authorizing any withdrawal from the Missouri River system for the Central ND Project.

### i. Whether Defendants Should Have Prepared an EIS

Plaintiff's first NEPA claim is that Defendants should have prepared an EIS. NEPA requires the preparation of an EIS only for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). "An agency's decision not to prepare an EIS can be set aside only upon a showing that it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763

(2004) (quoting 5 U.S.C. § 706(2)(A)). The court "must affirm" an agency's decision not to prepare an EIS where it took "a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI." *Newton Cnty. Wildlife Ass'n v. Rogers,* 141 F.3d 803, 809 (8th Cir. 1998). The "role for [the] reviewing court is to ensure that the agency takes a 'hard look' at environmental consequences, but not to substitute its own judgment for that of the agency." *Goos v. I.C.C.,* 911 F.2d 1283, 1291 (8th Cir. 1990) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

"The [Council on Environmental Quality] has promulgated regulations detailing how agencies should fulfill their NEPA obligations," listing "ten considerations that agencies should take into account when taking a 'hard look' at whether a project will have 'significant' environmental impacts." *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431 (8th Cir. 2004). Those "intensity" considerations are: (1) beneficial versus adverse impact; (2) effects on public health or safety; (3) the unique characteristics of the geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) the degree to which the effects would be highly controversial; (5) the degree to which possible effects are uncertain or unknown; (6) the extent to which the decision may establish a precedent for future actions with significant effects; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the effect on scientific, cultural, or historical sites or resources (9) the impact on endangered or threatened species and their habitats; and (10) whether the action may violate federal, state, or local environmental laws. 40 C.F.R § 1508.27(b)(1)-(10). An "agency need not exhaustively analyze every factor," though it "must base its determination 'upon factors listed in the appropriate regulations'" and must use a 'reasonable interpretation of the regulation and the statute' in reaching

its conclusion. *S. Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005) (citation omitted). The Court is not to "try to identify failures in clarity or detail . . . ." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983)). The Court may reverse the agency decision "only when there is no rational basis for the policy choice." *S. Dakota*, 423 F.3d at 800 (quotation marks and citation omitted).

The FONSI discusses the ten aforementioned regulatory considerations over approximately six pages and concludes that each showed that the Central ND Project would have no significant impacts. BOR-000014-19. As Reclamation based its determination on factors listed in the appropriate regulations, and Plaintiff has not argued that Reclamation's interpretation of the regulations was unreasonable or that its analysis of the considerations had no rational basis, the Court sees no basis upon which to find the issuance of the FONSI arbitrary or capricious. *See S. Dakota*, 423 F.3d at 80. Defendants therefore are entitled to summary judgment on Count I.

Insofar as Missouri contends that Reclamation should have prepared an EIS for the reasons alleged in its other counts, each claim is discussed below.

### ii. Whether Defendants Took a "Hard Look" at Adverse Impacts

Plaintiff asserts that Defendants failed to take a "hard look" at: (1) the cumulative impacts of the Red River Valley Project, (2) the direct, indirect, and cumulative impacts from the out-of-basin transfer of water, and (3) the direct, indirect, and cumulative impacts from the Central ND Project on downstream users of the Missouri Rivers.

To comply with NEPA, an EA must contain an evaluation of the cumulative impacts of a project. *Sierra Club v. U.S. Army Corps of Engineers*, 494 F. Supp. 2d 1090, 1095 (W.D. Mo. 2007) (citing cases). NEPA's implementing regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

Failure to analyze potential cumulative impacts may be "one of the most egregious shortfalls of [an] EA." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011). A final EA that "does not include a cumulative impact analysis" "will be ruled deficient . . . ." *Arkansas Wildlife Fed'n v. U.S. Army Corps of Engineers*, 431 F.3d 1096, 1101 (8th Cir. 2005).

Plaintiff argues that Defendants did not conduct the requisite analysis of "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."

Reclamation's evaluation of the Central ND Project commenced with scoping—the process of determining the scope of the appropriate analysis by soliciting public comments. BOR-000000013. Thereafter, in August 2017, Reclamation issued a draft EA. In response to public comments received on the draft EA concerning, *inter alia*, the draft EA's purpose and need statement, connected action discussion, geographic scope and cumulative impact analysis, and Missouri River depletions, Reclamation issued a revised Draft EA in April 2018. One of Plaintiff's agencies requested a 30-day extension and received a 15-day extension of time to review the revised draft. *Id.* Reclamation issued its final EA, along with a Draft FONSI, in July 2018. Reclamation then sought public comment on the draft FONSI as well.

The EA evaluated potential environmental impacts to a variety of resources, including water resources and hydrology (BOR-00000075-80); threatened and endangered species (BOR-

00000084-95); land resources (BOR-00000096-104); climate change (BOR-00000104-106); Indian Trust assets (BOR-00000106-107); and cultural resources (BOR-00000107-109).

The EA and FONSI were based in part upon and incorporated recent and comprehensive cumulative effects analyses, specifically (1) a 2013 report from the Corps, the Cumulative Impacts to the Missouri River ("Cumulative Impacts Report"); and (2) the impacts analysis from the Supplemental Environmental Impact Analysis ("SEIS") prepared by Reclamation in 2015 for the Northwest Area Project—another project that withdrew water from the Missouri River at Lake Sakakawea. *See* BOR-00000080-81. Reclamation expressly "determined the data and analysis completed in 2013 were sufficient and appropriate to use in the Missouri River impact analysis for th[e] EA," BOR-000000080-81, and also that "[t]he data and evaluation methods used [in the SEIS] remain[ed] valid," BOR-000000083.

The Cumulative Impacts Report, among other things, evaluated the hydrologic, navigation service, hydropower generation, and economic effects of five simulations—including reasonably foreseeable future depletions identified by Reclamation through the year 2060. BOR-00005248-49, 52, 54. The 2015 SEIS (which also partially relied on the data from the Cumulative Impacts Report, BOR000005042-43) evaluated and disclosed the potential impacts to the Missouri River and its various uses. BOR-00003292-5229.

The SEIS incorporated potential impacts downstream to the Missouri River's confluence with the Mississippi River. The analysis considered the impact on flows from Gavin Point Dam (the southernmost of the Corps' six dams on the Missouri Mainstem) (BOR-00003456; BOR-00003896); *see* BOR-00003620-40; BOR-00003740-49.)) The SEIS evaluated impacts to, among other uses and resources, economic navigation, flood control, recreation, water supply, and hydropower uses—and did so for both the upper and lower Missouri River. BOR-00003740-48.

19

For example, the analysis included discussion of navigation impacts to Kansas City. BOR-00003742. The depletions analysis explicitly includes Missouri, with discrete analyses for Nebraska City, Nebraska to St. Joe, Missouri; St. Joe to Kansas City, Missouri; Kansas City to Boonville, Missouri; and Boonville to Hermann, Missouri, the last gage before the Missouri River discharges into the Mississippi River near St. Louis. BOR-00003868-91.

With respect to historic and existing depletions, the EA relies on the depletions database that Reclamation maintains for all tributaries within the Missouri River Basin. BOR-00000081; *see also* BOR-00001032-1128 (Missouri River Basin Depletions Database).

As for future depletions, Reclamation explained its process for identifying them as follows:

> Reclamation updated a future Missouri River water withdrawal spread sheet [*sic*] updated in 2006 (Reclamation 2006, Red River Valley Water Supply Project EIS) and collected information on the potential new depletions within or from the Missouri River Basin between 2011 and 2060. These potential projects were identified by canvassing Reclamation offices throughout the Missouri River Basin and contacting the Bureau of Indian Affairs to document future tribal projects. When information was readily available, State or local projects were also included if the projects were authorized and funded. Using these data, it was possible to estimate the total anticipated withdrawals through the year 2060 for each Missouri River reach.

BOR-000000081. The EA explains the assumptions embedded in the collection. BOR-000000081-82. Further, the EA states that the analysis took "a conservative approach that may have overestimated future depletions." BOR-000000082. The EA also expressly states that the Red River Valley Project was "added to the list of reasonably foreseeable actions." BOR-000000082-83.

Reclamation concluded that, although some projects—including the state-sponsored Red River Project—had changed in scope since the 2015 SEIS analysis, the net change in the volume of reasonably foreseeable future action depletions was nearly zero. BOR-00000083-84. Reclamation explained that the existing average annual depletion above Garrison Dam is

approximately 6.6 million acre-feet.  BOR-00000080.  The Central ND Project would constitute an additional withdrawal of, at most, 14,483 acre-feet—an additional annual depletion of only 0.2%, representing only 0.06% of Lake Sakakawea's storage capacity.  *Id.*  The EA concluded that the cumulative impacts associated with the project would be very similar to those disclosed in Reclamation's 2015 SEIS, and "those impacts were negligible."  BOR-00000084.  Reclamation concluded that the effects on reservoir levels and dam releases likely would "not be measurable."  *Id.*

Reclamation issued its final FONSI and Final EA in September 2018, making its final determination that the project would not result in any significant environmental impacts, and therefore no environmental impact statement was required under NEPA.  BOR-000000003.

## A.  The Red River Valley Project

Plaintiff argues that Defendants failed to take account of the Red River Valley Project, the Northwest Area Project, and other Missouri River projects in North Dakota.  Plaintiff claims that Defendants looked only "at the Central ND Project in isolation. . . . ."

However, as discussed above, the record shows that Reclamation considered the potential cumulative impacts to the Missouri River of the Red River Valley Project, the Northwest Area Project and other past, present, and reasonably foreseeable projects.  *See, e.g.,* BOR-00000068-69; BOR-000000080.  Reclamation relied on the Corps' Cumulative Impacts Report and Reclamation's 2015 SEIS, both of which addressed reasonably foreseeable projects and other withdrawals from the Missouri River, including the Red River Valley Project.  BOR-00000082-83.  Reclamation expressly concluded, after considering the issue, that those analyses remained up-to-date.  BOR-00000080-83.  Reclamation determined that the cumulative impacts associated

with the Central ND Project would be very similar to those disclosed in Reclamation's 2015 Supplemental EIS, which "were negligible." BOR- 00000084.

Reclamation's reliance on prior analyses "to save money and time by avoiding repetitive inquiries" is appropriate—and even "encourage[d]"—under NEPA. *Arkansas Wildlife Fed'n*, 431 F.3d at 1101.

Plaintiff argues that Defendants improperly "segmented" the Central ND Project from the connected Red River Valley Project. It is true that "[a] piecemeal valuation of connected projects, or 'segmentation,' is not permitted under NEPA when the segmented project 'has no independent justification, no life of its own, or is simply illogical when viewed in isolation.'" *Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1132 (D. Minn. 2010) (quoting *One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004)). However, "[t]he point of the connected actions doctrine is to prevent the government from "'segmenting its own federal actions into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration.'" *Big Bend Conservation All. v. Fed. Energy Reg. Comm'n.*, 896 F.3d 418, 423–24 (D.C. Cir. 2018) (citation omitted). The doctrine does "not require the aggregation of federal and non-federal actions." *Id*. at 424. Thus, under the applicable regulations, the Red River Valley Project, which is sponsored by North Dakota and requires neither federal approval nor federal funding, is not a "connected action" for NEPA purposes.

Plaintiff concedes that the connected-actions doctrine does not require federal and non-federal actions to be aggregated, but nonetheless insists that "when projects are so interconnected as the [Central ND] Project and Red River Project, the agencies involved should consider both projects at least for the cumulative impacts analysis of a NEPA determination." Doc. 77, pp. 9-10. Plaintiff argues that the physical connection between the two projects—the "6 miles of pipeline

for delivery of up to 20 cfs from the Canal to the state-sponsored [Red River Valley Project]"—requires that the projects be considered together, not piecemeal. Plaintiff complains that Defendants sidestepped their responsibility to analyze the out-of-basin water transfer by relying on the fact that "the state-sponsored [Red River Valley Project] will proceed independent of the [Central ND Project] and does not need approvals from Reclamation."

These arguments fail because, as discussed above, the EA relied on earlier analyses—the 2015 SEIS and Cumulative Impacts Report—that considered the Red River Valley Project. As such, the EA's cumulative-impacts analysis took the effects of the Red River Valley Project into account. Thus, under the applicable regulations and interpreting law, Plaintiff's argument that the EA did not consider the Red River Valley Project fails.[4]

---

[4] Plaintiff and one amicus note that the Eastern North Dakota Project is yet another project along the Missouri River that North Dakota plans to connect to the Red River Valley Project, along with the Central ND Project. *See Missouri Basin and Arkansas-Rio Grande-Texas Gulf Regions Frequently Asked Questions*, BUREAU OF RECLAMATION, https://www.usbr.gov/gp/dkao/nepa/endaws/faq.html (last updated June 25, 2020, last accessed August 13, 2021). *See* John Soucy, *Notice of Intent to Prepare an Environmental Impact Statement and Public Scoping Comment Period for the Eastern North Dakota Alternate Water Supply Project, Burleigh, Kidder, Sheridan, and Wells Counties, North Dakota*, Federal Register,, https://www.federalregister.gov/documents/2019/11/13/2019-24611/notice-of-intent-to-preparean-environmental-impact-statement-and-public-scoping-comment-period-for (last updated Nov. 13, 2019, last accessed August 13, 2021).

Defendants concede that the EA does not expressly mention the Eastern North Dakota Project, but state that the 2015 SEIS and Cumulative Impacts Report, upon which the EA relied, forecasted similar future depletions, citing BOR-00000016 (Central ND Project FONSI); BOR-00000080-84 (Central ND Project EA); BOR-0000003467-68 (2015 SEIS Chapter 3 - Affected Environment); BOR-0000003620-40 (2015 SEIS Chapter 4 - Environmental Impacts). Plaintiff has not suggested otherwise. Thus, the Court concludes that Defendants' analysis accounted for such depletions.

In any event, the EIS analysis for the Eastern North Dakota Project will have to take account of the Central ND Project, so concerns about how that newer project will affect downstream users will be addressed by the Federal Defendants in that analysis.

### B. Out-of-Basin Transfer

Plaintiff also argues that Defendants' analysis was inadequate under NEPA because it did not consider the impacts of a transfer of water out of the Missouri River basin. Defendants argue that this contention is based on an incorrect premise because the Central ND Project will not involve an out-of-basin transfer of water.

While acknowledging that Reclamation lacks full control over where and how Red River Project water will be delivered, Reclamation addresses the concern about out-of-basin transfers of water by explaining that (1) "[a] Water Service Contract, issued for the project by Reclamation, will include conditions to maintain use of the 20 cfs entirely within the Missouri River Basin"; and (2) "the final proposed alternative incorporates infrastructure, including meters and controls, that will be utilized so the project does not withdraw more water from the Canal than will be needed by the [Central ND Project] users in the Missouri River Basin and will not be used to supplement water supplies for the [Red River Project]." BOR-0000168. Water used for the project will be transported to six North Dakota communities and water districts that are within the Missouri River basin. BOR-00000010. Reclamation also has committed to including in any Water Service Contract issued conditions requiring in-basin use of water. BOR-0057; BOR-0000168.

As a practical matter, water from the Central ND Project may be commingled with Red River Valley Project water in the pipeline, and some Missouri River water may end up outside of the Missouri River basin. While those outside of the Missouri River basin might complain about the impinging biota, it is not clear that Plaintiff has standing to complain of any such injury.

The record shows that Reclamation has taken steps to ensure that no more than 20 cfs of Missouri River water theoretically earmarked for use within the Missouri River basin—and supposedly not more than will be needed by users in the Missouri River Basin—will be channeled through the Central ND Project. The scope of Reclamation's analysis was limited accordingly.

24

There is no indication that the responsible Federal Defendants failed to adequately analyze the potential transfer of Missouri River water out of basin through the Central ND Project.

## C. Downstream Impacts

Plaintiff argues that Defendants improperly failed to consider potential impacts of the Central ND Project on downstream states.  Defendants acknowledge that Reclamation "was required to determine the incremental impact of the [Central ND Project] by assessing its impact on present conditions, and by assessing past, present, and reasonably foreseeable future actions." Defendants maintain, however, that Reclamation did so, and that Plaintiff simply ignores the "extensive prior work on depletions that informed" Reclamation's analysis.

The EA states that "[t]he Proposed Action will be limited in geographic context," and "[t]he environmental effects as described in the EA . . . will not be noticed beyond the local scale."  BOR-000000014.  This conclusion was premised on Reclamation's finding that "the proposed water service contract would utilize approximately 1.2% of the water appropriated to Reclamation from the North Dakota State Water Commission . . . ." AR at BOR-000000062.  Plaintiff contends that, if Defendants had properly considered the Central ND Project in conjunction with the Red River Valley Project and other projects located in North Dakota, as well as prior federal decisions affecting the Missouri River, they would have concluded that the Central ND Project represents "a significant withdrawal of water from the Missouri River."

As discussed above, Reclamation relied on the Cumulative Impacts Report and 2015 SEIS to consider downstream impacts, and considered the potential impact downstream of increased withdrawals from the Missouri River from the Central ND Project.  The analysis included impacts to navigation, water supply, recreation, and flood control, including downstream into Missouri. The Cumulative Impacts Report on which Reclamation relied in its analysis represents "the most

recent and comprehensive analysis of its kind within the Missouri River Basin . . . ." BOR-00000080. Reclamation also explained why it determined that the two prior analyses remained reliable to date. Such reliance is proper. *See Newton Cty. Wildlife Ass'n*, 141 F.3d at 809 ("If an agency has prepared an EIS for a large action, the regulations encourage it to incorporate EIS conclusions into EAs prepared for smaller, subsequent actions included within the broad program"). The agency's determinations in these technical areas within its expertise are subject to deference. *In re Operation of Missouri River Sys. Litig.*, 421 F.3d at 628.

Plaintiff also challenges Reclamation's reliance on the Final SEIS for the Northwest Area Project. The EA describes "[p]otential impacts of the [Central ND Project] on the Missouri River Mainstem System" as "very similar to the potential impacts disclosed in the Final SEIS for the Northwest Area Project," which "were negligible." BOR- 00000084. Plaintiff argues that "analysis of similar effects for a separate project does not excuse the failure to consider significant environmental impacts through an EIS." However, as discussed above, the federal agencies are entitled to rely on a prior EIS insofar as it is relevant, and there is no indication that the SEIS was not relevant. *See* 43 C.F.R. § 46.135 (discussing "[i]ncorporation of referenced documents into NEPA analysis"); *see also Arkansas Wildlife Fed'n*, 431 F.3d at 1101 (noting that reliance on prior analyses "to save money and time by avoiding repetitive inquiries" is appropriate—and even "encourage[d]"—under NEPA).

The cases Plaintiff cites in support of its contrary position are not on point. In *Muckleshoot Indian Tribe v. U.S. Forest Service*, the Ninth Circuit found that the EIS at issue did not account for the specific impacts of the proposed action. 177 F.3d 800, 810- 811 (9th Cir. 1999). Similarly, in *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*, the Ninth Circuit held that "'tiering' to a previous EIS is . . . permissible" only where "the previous

document . . . actually discuss[es] the impacts of the project at issue." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009). In that case, the draft EIS for an entirely different mine expansion did not appear to consider any of the effects of the mine expansion that was the subject of the court case. Here, in contrast, the EIS addresses the same major issues that the proposed action raised—the impacts of withdrawals from the Missouri River at Lake Sakakwea on flows and uses in both the upper and lower reaches of the river.

*     *     *

For the reasons discussed above, the Court finds that Plaintiff has not met its burden of proving that Defendants failed to adequately consider or disclose the adverse impacts of the Central ND Project. *See Voyageurs Nat'l Park Ass'n*, 381 F.3d at 763 (holding that the Court "must uphold" an agency determination if it is supportable on any rational basis); *Baltimore Gas & Elec.*, 462 U.S. at 103 (noting that a court "must generally be at its most deferential" when examining a scientific determination within an agency's special expertise); *see In re Operation of Missouri River Sys. Litig.*, 421 F.3d at 628 (noting that technical determinations are subject to deference). Defendants are entitled to summary judgment on Count III.

### iii.   Whether Defendants Took a "Hard Look" at Mitigation Measures

Plaintiff's next claim is that Defendants failed to take a "hard look" at mitigation measures for the Central ND Project. Defendants respond that where, as here, a FONSI is not dependent on imposing mitigation measures, no discussion of mitigation measures is required.

"The NEPA regulations do not require a discussion of mitigation measures in an environmental assessment." *Jensen v. Williams*, No. 08-2016, 2009 WL 1138800, at *4 (W.D. Ark. Apr. 27, 2009) (citing *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir.

27

2000)).  "[A]n EA need only explore mitigation measures where it acknowledges the possibility that the agency action will cause environmental harm . . . ."  *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 698 (10th Cir. 2015); *see also Jensen*, 2009 WL 1138800, at *4 ("An EA that properly supports a FONSI need only include a discussion of mitigation measures when there would be a significant chance of a significant impact in the absence of the mitigation measures." (citing *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir.2006))).  "This stands to reason" as "[i]t would make no sense to demand an articulation of mitigation measures when there is no anticipated harm to mitigate."  *WildEarth* Guardians, 784 F.3d at 698

Because the Court has not disturbed the agency's finding of no significant impact, there is no basis to conclude that analysis of mitigation measures was required.  Defendants are entitled to summary judgment on Count II.

### iv.  Whether Defendants Considered Reasonable Alternatives

Plaintiff argues that Defendants failed to consider reasonable alternatives to the Central ND Project.  Here, Defendants considered just one alternative to the Central ND Project: a "no action alternative" whereby the Red River Valley Project alone would be used to withdraw all of the 165 cfs of water North Dakota seeks.  Defendants maintain that the identification and evaluation of the one alternative to the Central ND Project was "informed by the extensive scoping and public comment processes Reclamation undertook."

Federal regulations require an EA to "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  Section 102(2)(E) provides that "all agencies of the Federal Government shall study, develop, and

describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

"When an agency has concluded through an Environmental Assessment that a proposed project will have a minimal environmental effect, the range of alternatives it must consider to satisfy NEPA is diminished." *Cent. S. Dakota Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 897 (8th Cir. 2001); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 871 (D.D.C. 1991) (noting that the D.C. Circuit "has suggested that the range of alternatives that must be considered be limited by a 'rule of reason,'" which "governs both which alternatives the agency must discuss and the extent to which it must discuss them,'" and "the smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct") (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 288 (D.C. Cir. 1988); *River Road Alliance, Inc. v. Corps of Engineers,* 764 F.2d 445, 452 (7th Cir. 1985)). Moreover, the "agency bears the responsibility for deciding which alternatives need to be considered under NEPA." *Missouri Min., Inc. v. I.C.C.*, 33 F.3d 980, 984 (8th Cir. 1994).

Here, Missouri does not suggest that the "range of alternatives" was too limited. Rather, Missouri argues that, because "the Red River Valley Project is capable of siphoning the extra 20 cfs in addition to the already used 145 cfs of water necessary to fully satisfy North Dakota's future needs for water" without the need for the Central ND Project, Defendants have not sufficiently analyzed the environmental impacts of the proposed action and the alternatives.

The 20 cfs that Plaintiff claims could more easily be withdrawn through the Red River Valley Project ultimately would come from the Missouri River, as would the 20 cfs that would be depleted through the Central ND Project. Defendants describe the provision of 20 cfs from the McClusky Canal and Pick-Sloan Program preference power, instead of the provision of 20 cfs

directly from the Missouri River, as a cost-saving proposal. Given that the no-action alternative and the Central ND Project would both involve the depletion of 20 cfs of Missouri River water, it is not clear that the no-action alternative would be significantly less impactful. An agency is not "required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" *Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F. Supp. 2d 1054, 1074 (D.S.C. 2011) (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.2004)). (quoting *Headwaters*, 914 F.2d at 1181).

Furthermore, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). In other words, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). When, as here, "an agency has considered relevant evidence and arrived at a rational result, a party's mere dissatisfaction with the agency's decision does not entitle it to relief." *Cent. S. Dakota Co-op. Grazing Dist.*, 266 F.3d at 898.

Insofar as Plaintiff implies that Defendants favored the Central ND Project over the no-action alternative, that too is not a basis for challenging Reclamation's determination. *See Env't Def. Fund, Inc. v. Corps of Engineers of U. S. Army*, 470 F.2d 289, 295 (8th Cir. 1972) ("[W]e do not agree with the view implicit in the contentions of appellants that NEPA requires agency officials to be subjectively impartial."); *see also Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F. Supp. 2d at 1074 ("As for Plaintiffs' claim that Defendants preferred from the Project's inception the approach that they ultimately chose, such preference alone does not run afoul of the law. NEPA 'does not require that agency officials be "subjectively impartial,"' only

that 'projects be objectively evaluated.'" (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)).[5]

Defendants are entitled to summary judgment on Count IV.

### b. Whether Defendants Violated the Water Supply Act of 1958

Plaintiff argues that, in approving water supply for the Central ND Project, Defendants also failed to obtain Congressional approval as required by the WSA and the Corps' own policy and guidance documentation.

The Missouri River Mainstem Reservoir System does not contain storage specifically dedicated for M&I water supply. The Corps' own regulations state that a "permanent storage reallocation should be performed under the Water Supply Act of 1958, as amended" for long-term agreements for water supply from Corps-controlled reservoirs. Engineering Regulation 1105-2-100 ¶ 3-8.b(4). The WSA authorizes the Corps or Reclamation to "include[]" storage in their reservoir projects for municipal and industrial water use. 43 U.S.C. § 390b(b). However, it states that "[m]odifications of a reservoir project heretofore authorized, surveyed, planned, or

---

[5] Plaintiff also complains that Defendants' failure to specify how the 20 cfs of water for the Central ND Project will be consumed within the Missouri River basin violates NEPA's requirement that agencies "specify the underlying purpose and need to which the agency is responding[.]" 40 C.F.R. § 1502.13. But Section 1502.13 pertains to EISs, not EAs, and therefore is not relevant here.

Plaintiff further argues that statements that the Central ND Project would utilize the water for industrial purposes and municipal water within the Missouri River basin "among other purposes,'" and that, "without the Central ND Project, the future 'water needs of the State of North Dakota, including MR&I water needs[,]' ha[ve] the 'potential to limit future industrial development within the region'" are so "broad and vague" as to "preclude consideration of alternative actions in violation of NEPA." Plaintiff argues that Defendants should have detailed how much water would be necessary to meet the needs of the communities. However, Plaintiff does not suggest that these considerations would have either shifted the balance between the no-action alternative and the proposed action or compelled Reclamation to consideration other alternatives. The argument thus appears to have no bearing on the sufficiency of Reclamation's consideration of alternatives.

constructed to include storage as provided in subsection (b) which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law." 43 U.S.C. § 390b(e).

The Central ND Project involves the issuance of a water service contract to Garrison Diversion for 20 cfs of water from the McClusky canal for M&I water supply for a period of forty years. Plaintiff complains that the project represents "a major operational change to the Missouri River reservoir system, in that it elevates M&I water supply above the Corps' two primary purposes in operating the reservoir system: flood control and navigation." Plaintiff argues that "[t]he Bureau's attempt to provide long-term M&I water supply from the Missouri River reservoir system without a reallocation of water supply from the Corps and without Congressional authorization is arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to Section 301 of the WSA, 43 U.S.C. § 390b and the APA, 5 U.S.C. § 706(2)(A)."

Given Reclamation's finding of no significant impact, which the Court has not disturbed, the Central ND Project cannot be described as either "seriously affect[ing] the purposes for which the project was authorized, surveyed, planned, or constructed" or "involv[ing] major structural or operational changes" so as to require congressional approval. 43 U.S.C. § 390b(e).[6]

---

[6] Defendants argue that the Central ND Project is within Congress' grant of authority to Reclamation outside of the WSA, under the Dakota Water Resource Act of 2000 and Garrison Diversion Unit Reformulation Act of 1986. The Garrison Diversion Reformulation Act of 1986 authorizes the Department of the Interior to "meet the water needs of the State of North Dakota, including municipal, rural, and industrial water needs . . . ." An Act to Implement Certain Recommendations Pursuant to Pub. L. No. 98-360, Pub. L. No. 99-294 (HR 1116) § 1(a)(2), 100 Stat. 418, 418 (1986). In addition, the act authorizes the Secretary of the Interior "to plan and construct a multi-purpose water resource development project within the State of North Dakota providing for . . . municipal, rural, and industrial water . . . and other project purposes in accordance with the Federal reclamation laws . . . ." Id., §(1)(b). Finally, the Secretary of the Interior "is authorized to construct municipal, rural, and industrial water systems to serve areas throughout the

Defendants are entitled to summary judgment on Plaintiff's fifth count.

**IV.     Conclusion**

For the reasons discussed above, the Court denies Plaintiff's motion for summary judgment and grants Defendants' cross-motions for summary judgment as to each count.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  August 24, 2021
Jefferson City, Missouri

---

State of North Dakota."  *Id.*, § 5(7)(a)(1).  However, notably, in a letter dated Aug. 17, 2001, in the context of the proposed Federal Red River Valley water supply project that did not proceed, then-Reclamation Commissioner John W. Key stated as follows with respect to the requirements of Section 8 of the Dakota Water Resources Act: "Reclamation's understanding is that any out-of-basin alternative selected to meet Red River Valley water supply needs would require authorization by Congress prior to design and construction."

Because the Court concludes that the finding of no significant impact is determinative, the Court need not determine whether the cited statutes authorize the Federal Defendants' actions.